# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Detention of: | No. 57777-1-II |
| F.S., | UNPUBLISHED OPINION |
| Petitioner. | |

CHE, J. — FS appeals the trial court's order committing her to 180 days of involuntary commitment. She argues that the State failed to prove that she was gravely disabled under RCW 71.05.020(24)(a). FS also argues that the State failed to prove that she presented a substantial likelihood of repeating similar violent acts. We disagree and affirm.

## FACTS

In December 2021, FS allegedly stabbed her brother and cut her mother with a kitchen knife. The State charged FS with first degree assault (domestic violence) and third degree assault (domestic violence). After FS was found not competent to proceed to trial, the trial court entered an order dismissing the charges without prejudice. FS was referred to Western State Hospital (WSH) for evaluation and treatment.

The State filed a petition to commit FS to involuntary treatment for 180 days. The petition alleged that FS was gravely disabled as a result of a behavioral health disorder, had been deemed incompetent and criminal charges for a violent felony offense—first degree assault—had been dismissed, and was substantially likely to repeat similar conduct as the index offense, and a less restrictive placement alternative WSH was not in her best interests. The case proceeded to jury trial.

Dr. Pinar Kirsch is a psychological evaluator at WSH who evaluated FS. Dr. Kirsch met with FS for approximately 30 minutes at the beginning of FS's time at WSH, talked with FS's team throughout her hospitalization and reviewed her chart records, and attempted to meet with FS again a few months later, but she declined. Dr. Kirsch diagnosed FS with schizophrenia based primarily on her delusional thinking and blunted affect. FS's delusional thoughts included that hospital staff were imposters who were poisoning her food, she was being sexually assaulted in her room, she was being stalked by a gang, and her family members were not her family members but rather gang members or nonhuman entities. Dr. Kirsch testified that FS does not believe she has a mental illness and does not have a good perception of reality.

Dr. Kirsch noted that FS is typically very isolated and does not engage or participate at WSH. He recalled an incident during which FS became agitated, demanded to be let go from WSH, and struck a security guard. He described another incident during which FS became verbally aggressive and started yelling at a peer.

Dr. Kirsch opined that FS maintains her hygiene independently and generally meets her nutritional needs, although she will only eat sealed food due to her fears of being poisoned. He doubted that FS could maintain safe and secure housing for herself based on her paranoid symptoms. He specifically expressed doubt that moving back to her family's home would be a viable safe option because she still holds the delusional belief that her family members are not her family members. Dr. Kirsch believes there is a substantial likelihood that FS would commit a similarly violent act in the future as her assault on her mother and brother. He emphasized that FS has not gained any insight into her mental health disorder, still holds paranoid delusional beliefs about her family, has not participated in treatment, and is declining medication that could

improve her paranoid delusions. Dr. Kirsch's concern whether FS will commit future similar violent acts is not limited to FS's family members because she has also expressed paranoid delusions about her former coworkers and hospital staff.

Lastly, Dr. Kirsch believes a less restrictive alternative placement would not be in FS's best interests because FS does not recognize the need for medication and is not capable of rational decisions regarding pursuing medical treatment.

Dr. Sukhinderpal Aulakh is a psychiatrist at WSH who treated FS from May to October 2022. Initially, Dr. Aulakh interacted with FS every week, eventually moving to every two or three weeks with FS getting more frustrated and not wanting to talk. Dr. Aulakh also diagnosed FS with schizophrenia based on FS's delusional beliefs that she had been sexually assaulted in jail and at the hospital and that her family members were being replaced by other people. Dr. Aulakh echoed Dr. Kirsch's assessment regarding FS's lack of insight into her mental health and her resistance to taking medication.

Dr. Aulakh had multiple concerns about FS's release. Dr. Aulakh was concerned that FS would repeat the violent incidents that led to her being at WSH if she were released. Dr. Aulakh was also concerned because FS believed her food was being poisoned leading FS to refuse food unless it was prepackaged, and sometimes even rejecting the prepackaged food. Dr. Aulakh noted that FS could target certain people due to her paranoid beliefs about being sexually assaulted.

Dr. Bhinna Park became FS's treating psychiatrist at WSH after Dr. Aulakh. Dr. Park's interactions with FS tended to be brief because FS had a high degree of paranoia toward anyone working in mental health. FS usually declined to speak with Dr. Park such that Dr. Park had to

go to FS's door to speak with her. Dr. Park explained that FS believes the staff at WSH are poisoning her food, people are sexually assaulting her every night, and the staff at WSH are actors in a play. FS also believes that her family members were being replaced by imposters affiliated with a gang and was very afraid of them. Dr. Park diagnosed FS with Capgras syndrome, which is a delusion when someone believes that either loved ones or other people have been replaced by imposters. Dr. Park agreed with the other witnesses that FS has schizophrenia. Dr. Park explained that FS refuses to take any medications and that the severity of her symptoms prevent her from participating in other treatments such as therapy. Dr. Park did not see any contact or notes from FS's family in FS's chart.

Dr. Park opined that FS could not provide for her own health and safety if released. Specifically, Dr. Park did not think FS could find and keep employment or housing, and would be at risk of harm. And although FS has not been assaultive while at WSH, Dr. Park is concerned that FS would be aggressive in the future if she were to return untreated to the community or to her family's home. Dr. Park noted that the risk of violence increases with the duration of untreated psychosis, such that the neurotoxicity "can lead to very unpredictable and erratic behaviors." Rep. or Proc. (RP) at 307. Dr. Park had significant concerns that FS "would be at imminent risk of further decompensation, becoming a victim herself or [] committing another act." RP at 312. She testified that "there's a significant risk that [FS] would commit the same [] alleged offense" if released to the community. RP 313.

Dr. Wendi Wacsmuth is a psychologist who met with FS one time, reviewed her records, and spoke with nurses and social workers that worked with FS. Dr. Wacsmuth noted that FS was generally cooperative during her interview. FS expressed to Dr. Wacsmuth her belief that

numerous people in the community and at WSH were conspiring against her to provoke her into doing something to be detained. FS also told Dr. Wacsmuth that people at her previous employment were targeting or stalking her. Dr. Wacsmuth also diagnosed FS with schizophrenia based on her delusional thoughts and flattened affect.

Dr. Wacsmuth does not believe FS has a substantial likelihood of committing similar violent acts in the community. Dr. Wacsmuth noted that clinical judgment alone regarding likelihood of reoffending in a similar way is about 50 percent accurate. Dr. Wacsmuth based her opinion on the use of an actuarial tool—the Violence Risk Appraisal Guide-Revised (VRAG), and a structured professional judgment tool—the Historical Clinical and Risk Assessment-20 Version 3 (HCR-20). Dr. Wacsmuth explained that the two tools have a 25 percent greater accuracy at predicting the likelihood of committing violent acts compared to clinical judgment alone. Based on those tools, FS was in the "very low risk profile" RP 347. Dr. Wacsmuth acknowledged that the actuarial tools are not recommended to be used with females, and they do not take into account several factors like whether the individual was treated, type of mental illness, recency of a crime or psychotic break, and specific crimes and their circumstances, among other things.

Dr. Wacsmuth does not believe FS is gravely disabled. She believes FS would be able to meet her essential human needs including housing, food, and other basic needs if she were released into the community. Dr. Wacsmuth recounted that FS's plan for release was to go to a women's shelter in King County and then seek out permanent housing.

No. 57777-1-II

FS informed the trial court that she had no exceptions to the proposed jury instructions.

The jury returned "yes" verdicts to each of the following questions:

> 1. Does the respondent, [FS] have a behavioral health disorder?
>
> 2. Is [FS] gravely disabled as a result of a behavioral health disorder?
>
> 3a. Have criminal charges against [FS] been dismissed due to a finding of incompetence, and did [FS] commit acts constituting a felony, specifically: Assault in the First Degree?
>
> 3b. Does [FS], as a result of a behavioral health disorder, present a substantial likelihood of repeating similar acts?
>
> 4. Has the petitioner proved that the best interest of [FS] or others will not be served by less restrictive treatment that is an alternative to detention?

Clerk's Papers (CP) 88-89. FS asked to poll the jury on the questions. All 12 jurors agreed on the verdict in every question except for whether a less restrictive treatment that is an alternative to detention was appropriate. Of the jurors, 11 out of 12 agreed the State had shown that a less restrictive alternative to detention was not in the best interests of FS.[1] The trial court entered an order committing FS to 180 days of involuntary treatment at WSH.

FS appeals.

ANALYSIS

A person may be involuntarily committed for the first time for up to 90 days if the individual is gravely disabled due to a behavioral health disorder. Former RCW 71.05.280(4) (2020), former RCW 71.05.320(1)(a) (2020). A person can also be committed for up to 180 days of involuntary treatment if they have been found incompetent to stand trial and criminal charges

---

[1] It is well established that due process guarantees in commitment proceedings are satisfied when 10 out of 12 jurors agree upon a verdict. RCW 4.44.380; *Matter of McLaughlin*, 100 Wn.2d 832, 845, 676 P.2d 444 (1984).

have been dismissed, has committed acts constituting a violent felony, and "presents a substantial likelihood of repeating similar acts" due to a behavioral health disorder. Former RCW 71.05.280(3)(b) (2020),former RCW 71.05.320(1)(c).

FS argues that the State failed to prove that she should be involuntarily committed for 180 days as a result of her behavioral health disorder. Specifically, she argues that the State failed to prove that she was gravely disabled and that she presented a substantial likelihood of repeating similar violent acts. We disagree.

## I. GRAVELY DISABLED

A person can be involuntarily committed if they are "gravely disabled."[2] Former RCW 71.05.280(4). There are two ways the State may prove that a person is "gravely disabled." *In re Det. of LaBelle*, 107 Wn.2d 196, 202, 728 P.2d 138 (1986). Under former RCW 71.05.020(21) (2020), a gravely disabled person is one who

> as a result of a behavioral health disorder: (a) Is in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety; or (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety.

At trial, the jury was instructed on both prongs of the definition for grave disability and returned a general verdict without specifying under which prong it found FS gravely disabled.

FS argues that insufficient evidence supported a finding of grave disability under prong (a) of former RCW 71.05.020(21). She does not challenge the evidence supporting a finding of grave disability under prong (b). FS argues that reversal is required because there is no way to

---

[2] The order at issue in this case has expired. However, because involuntary commitment orders have collateral consequences for future commitment determinations, this appeal is not moot. *In re Det. of M.K.*, 168 Wn. App. 621, 622, 279 P.3d 897 (2012).

tell whether the jury relied solely on prong (a), which she contends is supported by insufficient evidence. Br. of Appellant 23. But FS's argument fails because substantial evidence supports a finding of grave disability under both prongs.

The State bears the burden of proving that a person is gravely disabled by clear, cogent, and convincing evidence. *In re* Det. of M.W., 185 Wn.2d 633, 656 374 P.3d 1123 (2016). This standard means that the State must show that it is "highly probable" that the person is gravely disabled. *In re Det. of Labelle*, 107 Wn.2d at 209. On appeal, we "will not disturb the trial court's findings of 'grave disability' if supported by substantial evidence which the lower court could reasonably have found to be clear, cogent and convincing." *Id*. We review challenges to the sufficiency of the evidence in a light most favorable to the State. *In re Det. of B.M.*, 7 Wn. App. 2d 70, 85, 432 P.3d 459 (2019). Courts "must consider the symptoms and behavior of the respondent in light of all available evidence concerning the respondent's historical behavior." Former RCW 71.05.245(1) (2020).

FS does not challenge the sufficiency of the evidence to support a grave disability finding under prong (b), so we focus only on whether substantial evidence supported the jury's finding of grave disability under prong (a). Under former RCW 71.05.020(21)(a), the State must show that an individual "is in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety." This requires a showing of a substantial risk of serious physical harm, evidenced by:

> failure or inability to provide for such essential human needs as food, clothing, shelter, and medical treatment which presents a high probability of serious physical harm within the near future unless adequate treatment is afforded. Furthermore, the failure or inability to provide for these essential needs must be shown to arise as a result of mental disorder and not because of other factors.

*Labelle*, 107 Wn.2d at 204-05. The State need not show that an individual would fail to provide for all essential human needs; rather the State need only present evidence that an individual's failure to provide for at least one essential human need would result in a high probability of serious physical harm unless adequate treatment is afforded. *See In re Det. of A.F.*, 20 Wn. App. 2d 115, 127, 498 P.3d 1006 (2021) (holding that an individual's mental illness that prevented him from seeking out and obtaining appropriate medical care supported a finding of grave disability). The risk of danger of serious physical harm must be substantial, but it need not be imminent. *Labelle*, 107 Wn.2d at 203-04.

FS contends that the evidence at trial did not support a finding that she was incapable of meeting her needs for food or clothing. While FS's paranoid delusions about her food being poisoned typically limits her to eating sealed food—which she also sometimes rejects, there was no evidence that this created a risk of serious physical harm or otherwise impacted her nutrition. And the witnesses all agreed that FS was capable of dressing herself and maintaining personal hygiene independently. But the State need not show that FS would fail to provide for all of her essential human needs; it need only present evidence that she cannot provide for at least one essential human need and that failure would lead to a high probability of serious physical harm.

The evidence supported a finding that FS's mental disorder caused her to be incapable of obtaining and maintaining appropriate medical care. FS denies that she has any mental illness and refuses to take any medication or participate in treatment. As a result, she continues to have paranoid delusions including that her family members and hospital staff are imposters, that there is a conspiracy to provoke her, and that her former coworkers were stalking her. She also believes that she was routinely sexually assaulted at jail and at WSH. Despite these beliefs and

claims of pelvic pain, FS's delusions made her refuse pelvic exams. This evidence shows that her untreated mental disorder prevents FS from seeking and maintaining medical treatment necessary to prevent serious physical harm.

Taking the evidence in the light most favorable to the State, as we must, we hold that the evidence is sufficient to persuade a rational, fair-minded person that FS is in danger of serious physical harm resulting from a failure to provide for her essential human needs of health or safety. Accordingly, substantial evidence supports the jury's verdict finding FS gravely disabled.

## II. SUBSTANTIAL LIKELIHOOD OF REPEATING SIMILAR VIOLENT ACTS

FS also argues that the State failed to show that she had a substantial likelihood of repeating similar violent acts. We disagree.

When a court finds that an individual is incompetent to stand trial for felony charges, the charges are dismissed without prejudice and the individual "must undergo a mental health evaluation for civil commitment and treatment." *In re Det. of M.W.*, 185 Wn.2d at 642; RCW 10.77.086(4). An individual may be committed for up to 180 days of involuntary treatment if the individual has been found incompetent to stand trial and criminal charges have been dismissed, has committed acts constituting a felony, and "presents a substantial likelihood of repeating similar acts" due to a behavioral health disorder. Former RCW 71.05.280(3); former RCW 71.05.320(1)(c).

Here, FS allegedly stabbed her brother and cut her mother's hand with a kitchen knife, at least in part due to her paranoid delusions that they were not actually her family members. At the trial, Dr. Park, Dr. Aulakh, and Dr. Kirsch all testified that they believe FS presents a substantial likelihood of repeating similar violent acts if released from commitment. They each pointed to

FS's lack of insight into her mental illness and her refusal to engage in treatment as significant concerns. They noted that FS's paranoid delusions that her family members were imposters and that there was a conspiracy to provoke her persisted without treatment, which contributed to the original incident. In particular, Dr. Park testified that although FS had not been assaultive while at WSH, Dr. Park worried that FS would be aggressive in the future if she were to return to the community untreated and without the controlled structure of WSH. Dr. Kirsch testified that the concern for violent acts is not limited to FS's family members because she has also expressed paranoid delusions about her coworkers and hospital staff.

Dr. Wacsmuth's opinion diverged from the other witnesses in that she believed FS did not present a substantial likelihood of repeating similar violent acts. She based her opinion on the results of two actuarial tools, which she believed are more accurate than clinical judgment alone. But we will not reweigh the evidence on appeal; rather, we defer to the jury's findings so long as they are supported by substantial evidence. *B.M.*, 7 Wn. App. 2d at 85.

Moreover, there are valid reasons a rational, fair-minded person would have given Dr. Wacsmuth's opinion less weight than that of the WSH staff. The WSH staff who testified spent significantly more time interacting with and observing FS over a longer period of time than Dr. Wacsmuth who met with her once. Further, the actuarial tools Dr. Wacsmuth employed and contended are more accurate than clinical judgment alone are not recommended for use with female patients, of which FS is, and do not take into account several factors like whether the individual was treated, type of mental illness, recency of the crime or psychotic break, and specific crimes and their circumstances

No. 57777-1-II

Taking the evidence in the light most favorable to the State, this evidence is sufficient to persuade a rational, fair-minded person that FS presented a substantial likelihood of repeating acts similar to the assaults on FS's mother and brother. We hold that the jury's finding is supported by substantial evidence that the jury could reasonably have found to be clear, cogent, and convincing. *See LaBelle*, 107 Wn.2d at 209. Therefore, it was not error for the jury to find that FS presented a substantial likelihood of repeating similar acts.

CONCLUSION

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Che, J.
_____
Che, J.

We concur:

Maxa, P.J.
_____
Maxa, P.J.

Price, J.
_____
Price, J.

12